UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____

PEDRO ALVAREZ, JR.                    |
        Plaintiff                    |
                                     |
vs.                                   |     C.A. No.: 1:19-cv-00392-WES-PAS
                                     |
TOWN OF BURILLVILLE;                  |
COL. STEPHEN C. LYNCH                 |
Of the Burrillville Police            |
Department                            |
        Defendants                   |
_____|

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**Introduction**

      This case is not difficult. The Second Amendment to the United States Constitution and Article 1, Section 22 of the Rhode Island Constitution secure a right to carry arms for lawful purposes, including, but not limited to, self-defense. Defendants refusing to acknowledge that in Rhode Island, carrying arms is a statutory and constitutional right, contrary to both Rhode Island and Federal law, summarily revoked Plaintiff's previously issued concealed carry permit based on social media pictures depicting the Plaintiff peacefully posing with individuals who had been indicted for certain crimes. Prior restraints on constitutionally-protected conduct cannot allow regulators unbridled discretion in choosing who may exercise the right. Moreover, when a regulator revokes a permit, basic principles of due process and fundamental fairness dictate that the decision must be undertaken with sufficient process to protect against erroneous or arbitrary decisionmaking. Here the implementation of Rhode Island's Firearms Act by Burrilville officials, violates these basic prior restraint and due process standards.

**The Regulatory Framework**

Rhode Island criminalizes the unlicensed public carry of a pistol or revolver. See R.I. Gen. Laws 1956 § 11-47-8(a) (". . . Every person violating the provision of this section shall, upon conviction, be punished by imprisonment for not less than one nor more than ten (10) years, or by a fine up to ten thousand dollars ($10,000), or both . . .") There is a two tiered licensing scheme in place to seek the requisite permit. The Attorney General, is empowered, *at his discretion*, under § 11-47-18 to issue pistol permits ". . . upon a proper showing of need . . . ." In contrast to the permit available through the Attorney General, the General Laws provide in pertinent part that:

> The licensing authorities of any city or town shall, upon application of any person twenty-one (21) years of age or over having a bona fide residence or place of business within the city or town, or of any person twenty-one (21) years of age or over having a bona fide residence within the United States and a license or permit to carry a pistol or revolver concealed upon his or her person issued by the authorities of any other state or subdivision of the United States, issue a license or permit to the person to carry concealed upon his or her person a pistol or revolver everywhere within this state for four (4) years from date of issue, if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed.

§ 11-47-11(a).

In Rhode Island, firearms law is the exclusive providence of the State. The General Assembly has expressly preempted the field. See § 11-47-58 ("The control of firearms, ammunition, or their component parts regarding their ownership, possession, transportation,

2

carrying, transfer, sale, purchase, purchase delay, licensing, registration, and taxation shall rest solely with the state, except as otherwise provided in this chapter.")

As the Rhode Island Supreme Court has observed,  "[t]wo separate and distinct licensing procedures are set forth in the Firearms Act." Mosby Devine, 851 A. 2d 1031, 1047 (2004).  We observed that the licensing procedure in § 11-47-18, which was at issue in Mosby, "provides for the discretionary grant of a firearms license by the [D]epartment [of the Attorney General] `upon a proper showing of need' . . . ." Gadomski v. Tavares, 113 A. 3d 387, 389-390 (2015) (quoting Mosby, 851 A.2d at 1047). "In contrast," noted the court "§ 11-47-11, which grants local officials the power to issue licenses, "is mandatory—an applicant who meets the criteria set forth in § 11-47-11 is entitled to a gun permit."" Id. (quoting Mosby, 851 A.2d at 1047). Once a permit has been duly issued it may only be revoked for "just cause at any time by the authority granting it . . . . " § 11-47-13.

**Facts and Procedural Posture**

Plaintiff Pedro Alvarez Jr. is a resident of the Harrisville village of the Town of Burillville Rhode Island. SOF 1[1]. On or about December 21, 2016, Plaintiff submitted his application to carry a concealed pistol to Colonel Lynch. SOF 3. Mr. Alvarez completely and truthfully completed his application. SOF 27. Consistent with Burillville's application and policy, Burillville undertook an extensive background check of the Plaintiff. SOF 4, 24. Having successfully completed the background checks Mr. Alvarez was approved and issued a concealed carry permit on or about January 25, 2017. SOF 5.

---

[1] "SOF" refers to the LR Cv56 Statement of Disputed Facts.

3

Approximately 17 months later, on or about May 22, 2018 Col. Lynch was made aware, by his son, a detective in the Rhode Island State Police of the existence of pictures from Mr. Alvarez's allegedly from Mr. Alvarez' facebook page depicting him in social situations with certain individuals identified as member of one of two local biker gangs who had been indicted as a result of a recent criminal investigation. SOF 6, 17, 18.  Col. Lynch's son informed Col. Lynch that Mr. Alvarez was not a member of either of the gangs. SOF 19.

The pictures do not depict Mr. Alvarez engaging in any criminal conduct. SOF 28. At the time of his application to the present, Mr. Alvarez has been entrusted with saving lives as a member of the Harisville Volunteer Fire Department. SOF 29. He had previously passed an extensive DCYF background check to serve as a foster parent. SOF 30. He also passed a Rhode Island interagency and an interstate III background check as a part of his application process. SOF 31.

Based exclusively on the pictures, on the morning of June 8, 2018, Col. Lynch dispatched Lt. Pitts of the Burillville police department to inform Mr. Alvarez that his concealed carry permit was revoked and to retrieve Mr. Alvarez' permit. SOF 32. Lt. Pitts told Alvarez that the decision was made and he could not change it. SOF 35. At no time either prior to or after the revocation did Col. Lynch notice or offer a hearing for Mr. Alvarez to clarify the record or contest his permit revocation. SOF 37. At the time of the revocation, Mr. Alvarez was a sworn United States Army recruit. SOF 38. He has subsequently, after passing an FBI background check, been granted a secret security clearance and serves as a United States Army Military Police Officer. SOF 39. As a federal law enforcement officer, Mr. Alvarez is statutorily granted a right to concealed carry. 18 USC § 926B. SOF 40.

4

Mr. Alvarez has long prepared for a career in law enforcement. Since having his permit revoked, Mr. Alvarez has inquired of hiring police department personnel who have regularly told him that having had a permit revoked would constitute a black mark that would make getting hired much more difficult. SOF 41. At his deposition in connection with this matter, Col. Lynch admitted as much and indicated that he would not hire an applicant in Alvarez' position. SOF 42. Accordingly, Mr. Alvarez brought the instant action challenging the unlawful revocation of his Rhode Island concealed carry permit.

**The Second Amendment claim**

The Second Amendment provides that "the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. "[I]t is clear that the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." McDonald v. City of Chicago, Ill., 561 U.S. 742, 778 (2010).

The appropriate analytical framework with which to weigh Second Amendment claims is a subject of much debate among the Circuit Courts.  Relying on the approach taken in *District of Columbia v. Heller* (Heller I), 554 U.S. 570, 634 (2008), some Circuits have analyzed the original understanding of the Second Amendment's text and the historical understanding of the right's scope. *Heller* at 626-627. *See also Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017); *Moore v. Madigan*, 702 F. 3d 933, 934 (7th Cir. 2012); *Gowder v. Chicago*, 923 F.Supp.2d 1110, 1123 (N.D. Ill. 2012).

In contrast, other courts have applied what at least once U.S. District Court judge has described as "a tripartite binary test with a sliding scale and a reasonable fit." *Duncan v. Becerra*,

265 F.Supp.3d 1106, 1117 (S.D. Cal. 2017), aff'd, 742 Fed.Appx. 218 (C.A.9 2018).

Summarizing this approach, the judge explained,

> For a Second Amendment challenge, the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit. In other words, there are three different two-part tests, after which the sliding scale of scrutiny is selected. Most courts select intermediate scrutiny in the end. Intermediate scrutiny, in turn, looks for a "reasonable fit." Courts in other circuits tend to also use some variation of a multi-part test with the result that intermediate scrutiny is applied to gun restrictions. It is, unfortunately, an overly complex analysis that people of ordinary intelligence cannot be expected to understand. These complicated legal tests, which usually result in Second Amendment restrictions passing an intermediate scrutiny test (a test that is little different from a rational basis test), appear to be at odds with the simple test used by the Supreme Court in Heller.

*Duncan v. Becerra*, 265 F.Supp.3d 1106, 1117 (S.D. Cal. 2017), aff'd, 742 Fed.Appx. 218 (C.A.9 2018). *Heller* expressly rejected an "interest-balancing inquiry, with the interests protected by the Second Amendment on one side and the governmental public-safety concerns on the other . . ." *Heller* at 689, (BREYER, J., dissenting.) The right to keep and bear arms is not the only Constitutional right that has controversial public safety implications. All the Constitutional provisions that impose restrictions on law enforcement and inhibit the prosecution of crimes fall into the same category. McDonald, 561 U.S. at 783 (collecting cases where those likely guilty of a crime are set free because of constitutional rights). Nevertheless, courts applying this approach generally employ an interest balancing that examines "how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *United States v. Chovan*, 735 F.3d 1127, 1136 (C.A.9 2013).

Arguing that Plaintiff's reliance on Heller is misplaced, Defendants point to two Circuit Court decisions, *Peterson v. Martinez*, 707 F.3d 1197, 1212 (10th Cir. 2013) and *Peruta v. Cnty.*

*Of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016), that apply the interest balancing approach to conclude that concealed carry rights are outside the scope of the Second Amendment's protections. [2] But regardless of which analytical framework the court adopts the Circuit Courts are deeply split on the questions of whether and to what extent the Second Amendment protects a right to concealed carry. Thus, in *Wrenn v. District of Columbia*, 864 F.3d 650, 665 (D.C. Cir. 2017) applying the *Heller* textual and historical analysis approach the D.C. Circuit invalidated a "good reason" requirement for the issuance of concealed carry permits within the district where open carry was otherwise banned because the "good reason" requirement impermissibly burdened the Second Amendment rights of individuals. *Id*. at 663. The court held that restrictions on the manner of bearing arms were permissible, but that "the law must leave responsible, law-abiding citizens some reasonable means of exercising" the right. *Id*.  *See also Moore v. Madigan*, 702 F. 3d 933, 934 (7th Cir. 2012) (striking down Chicago's ban on carrying a gun 'ready to use'). Notably, in a case that is difficult to square with *Peruta v. Cnty. Of San Diego*, 824 F.3d at 942, a 9th Circuit panel recently held that where concealed carry was prohibited in Hawaii, open carry must be permitted. See *Young v. Hawaii*, 896 F.3d 1044 (9th Cir. 2018) (pending en banc argument to occur the week of 9/21/2020).

Defendants point to the First Circuit's decision in *Hightower v. City of Boston*, 693 F. 3d 61, 74 (2012), for the proposition that "[t]he ability for a licensing authority to determine the unsuitability of a particular individual does not violate Second Amendment rights where a

---

[2] While it is true that the *Peterson* Court concluded that concealed carry was outside the scope of Second Amendment protection, that court conducted its analysis on the assumption that Open Carry was available throughout Colorado, as it expressly declined to consider the concealed carry licensing scheme in light of a local ordinance that prohibited open carry. As such, the Peterson Court's analysis presumes a right of Open Carry while addressing the scope of Second Amendment protection for concealed carry. *See Peterson*, 707 F.3d at 1208.

licensing authority revoked a concealed carry license on the grounds that an individual was deemed unsuitable for such a license." Defendants Town of Burillville and Col. Stephen Lynch's Memorandum of Law in Support of Their Motion for Summary Judgment ("Defendant's Memo") at 5. Defendants read *Hightower* far too broadly. After a former Boston Police officer resigned from the police force, her unrestricted concealed carry permit was revoked when it was determined she lied on her permit application. *Hightower v. City of Boston*, 693 F. 3d 61, 74 (2012).

> Hightower attacks many provisions of the statute, but her key focus is on what she contends is the inherent subjectivity of the "suitability" requirement and its inadequacy as a standard. However, Hightower's license was not revoked because of a general finding that she was not "suitable," but rather because of a particular determination that she "completed the application form untruthfully."

Id at 693 F. 3d 74. Hightower thus stands for the uncontroversial proposition that an applicant for concealed carry permits may constitutionally be determined to be unsuitable when they lie on the application. *Id*. *Hightower*'s holding was so straightforward that the court declined to specify an applicable level of scrutiny.

> We conclude that the revocation of a firearms license on the basis of providing false information as to the existence of pending complaints or charges on the firearms license application form is not a violation of the Second Amendment in this case. . . Her claim fails whatever standard of scrutiny is used, even assuming there is some Second Amendment interest in carrying the concealed weapons at issue.

Id at 693 F. 3d 74

The First Circuit has since clarified its analytical approach, at least with respect to determinations of need or purpose in exercising a Second Amendment right. In upholding a so called "need" requirement for the issuance of concealed carry licenses in certain Massachusetts

municipalities, the First Circuit recently undertook a historically informed interest balancing approach. *Gould v. Morgan*, 907 F. 3d 659 (1st Cir. 2018). After examining the local history of need based permitting in Massachusetts which dated back to the 1830s and observing the language in Heller describing the self-defense interest secured by the Second Amendment as "most acute" but not exclusively within the home and the *Heller* court's declaration that prohibitions on carrying firearms in "sensitive places" are "presumptively lawful," 554 U.S. at 626-27 & n.26 (a pronouncement which would not have been necessary if the right ended at the homes front door) the court *Gould* court concluded that concealed carry is covered by periphery of the Second Amendment such "that a law or policy that restricts the right to carry a firearm in public for self-defense will withstand a Second Amendment challenge so long as it survives intermediate scrutiny." *Gould*, 907 F. 3d at 673. Finding that the "good reason" requirement of the challenged provisions was substantially related to the interests in public safety, the Gould Court upheld the provision finding that "the defendants have forged a substantial link between the restrictions imposed on the public carriage of firearms and the indisputable governmental interests in public safety and crime prevention." *Id*. at 907 F. 3d 674.

**Applying the Second Amendment Tests**

Plaintiff brings an as applied challenge to his license revocation. Plaintiff respectfully submits that where, as here, an applicant has an unchallenged, predetermined need to concealed carry, the D.C. Circuit's approach recognizing the "Amendment's core as including a law-abiding citizen's right to carry common firearms for self-defense beyond the home (subject again to relevant "longstanding" regulations like bans on carrying "in sensitive places")" is the one mandated by *Heller* and the text of the Second Amendment. *See Wrenn v. Dist. of Columbia*, 864 F. 3d at 657. As the Wrenn Court notes "[t]his reading finds support in parts of Heller I that speak louder than the Court's aside about where the need for guns is "most acute." Id. at *Wrenn v.*

*Dist. of Columbia*, 864 F. 3d at 657 – 659. Defendants have presented no cases or analysis suggesting that restricting an applicant with a state recognized need to carry concealed from doing so based merely on the existence of photographs depicting social interactions finds no basis in historical or longstanding regulations of the right. Certainly, there are no longstanding historical restrictions on a citizens carry rights based on their social interactions or social media posts. Particularly so when said social interactions are not part of a joint criminal enterprise or when those posts do nothing to suggest criminality or violence.  Moreover, such an approach risks tremendously overbroad burdens on the right. For this reason, even if this court settles on intermediate scrutiny as the appropriate standard, Plaintiff must prevail. Allowing a local official unfettered discretion to determine suitability unconnected to any discernable standard risks both an alarmingly overboard restriction that fails to meet the "reasonable fit" described by the First Circuit. *Gould*, 907 F. 3d at 674. In assessing this fit," a perfect match is not required" but must be "a reasonable fit... such that the law does not burden more conduct than is reasonably necessary." *Id*. Unlike the needs based determination, state and federal law provide a panoply of criteria by which a suitability determination is to be evaluated, but social contacts are not among them.

Here Mr. Alvarez' need for a concealed carry arm is undisputed. Instead, Col. Lynch claims unlimited discretion to deny Plaintiff his concealed carry rights because he has determined, based on pictures that show Mr. Alvarez, who has no criminal history or other disqualifying factors under state law, in a social setting with certain other individuals who have been indicted as criminals. But as the Supreme Court has explained, "the very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554

US at 570. Plaintiff's challenge here is as applied, not facial. He does not contest that state law requires local licensing authorities to make suitability determinations as a condition for the issuance of a license to concealed carry under 11-47-11(a). But he contends that this discretion must be limited as a matter of both constitutional and statutory law, and that the state has no interest in preventing someone with his qualifications and background from exercising a concealed carry right.[3] The Court in *Heller* said that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id*. at 626-27 These regulatory measures are "presumptively lawful." Id. at 627 n.26; *accord McDonald*, 561 U.S. at 786, (plurality opinion). Even accepting as true, that Defendant has a social "association" with members of an outlaw biker gang, an assertion which Plaintiff expressly denies. A mere social 'association' is insufficient under Heller's identified categorical and locational restrictions. *See Heller*, 554 US at *627*.   Human beings are social creatures likely to have social contact with hundreds, if not thousands of people over the course of a year. While plaintiff does not deny knowledge of or limited social interaction with the individuals identified by the Defendants as members of the Thus Riders or Pagans, Plaintiff fully and completely contests that such interactions constitute an affiliation, joint venture, membership, or ongoing criminal association with the identified members. Moreover,

Unsurprisingly given the guidance provided in Heller about the types of restrictions that are presumptively lawful, Plaintiff's counsel was not able to identify any cases addressing an instance where the government claimed the authority to deny citizens concealed carry rights

---

[3] Plaintiff further contends that this description must be limited not only under the Second Amendment to the Untied States Constitution, but that it both must be and is

based on a mere social contact. Such a broad claim is far afield. *See Id.* But even where the Supreme Court has suggested presumptive validity of certain types of restrictions, Courts have recognized that proper tailoring requires the government to substantiate its claim that a particular scope of restriction sufficiently advances the governmental interest. Thus for example, in U.S. v. Carter the 4th circuit, "applying the intermediate scrutiny standard that Congress had an important objective for enacting § 922(g)(3) to reduce gun violence,  and might have reasonably served that objective by disarming drug users and addicts," vacated a judgment and remanded for further proceedings where "the government failed to make the record to substantiate the fit between its objective and the means of serving that objective. 669 F.3d 411 (4th Cir. 2012)." So too here, the Defendants present no evidence that suggests that those who have social contacts with gang members proportionally advances the goal of reducing gun violence. *Id.* at 419.

Col. Lynch heard no evidence nor made any findings of fact, nor is there an evidentiary basis to support the contention that Mr. Alvarez had an "affiliation" with any gang or gang members as asserted by the Defendants in their Motion for summary judgment. Contrary to the Chief's contention the pictures are insufficient to establish that Mr. Alvarez had an "affiliation" with the individuals depicted in the images nor that the extent of any relationship or interactions he may have had with such individuals. Similarly, the images reveal nothing about when they were taken or the length of time Mr. Alvarez had an interaction with the other individuals depicted. The pictures reveal nothing about Mr. Alvarez' knowledge about the depicted individuals character or activities, criminal or otherwise and the images certainly fail to substantiate that Mr. Alvarez had an affiliation, joint venture, membership, or other criminal connection with the other individuals depicted. Certainly nothing in the images is sufficient to transmogrify his outstanding record as a citizen into one of someone unsuitable to exercise his

concealed carry rights. The pictures reveal nothing about Mr. Alvarez that can justify impeding his right to concealed carry.   Given that review must consist of some degree of scrutiny beyond mere rational basis, Defendant cannot prevail regardless of what level of scrutiny this court ultimately applies. *Gould*, 907 F. 3d at 673 See id. at 628 n.27, ("the Court [Supreme Court has] made clear that rational basis review would not be sufficient.") Even if the claim to regulate based on social interactions only burdens an exercise of the right's periphery, Social interactions simply not a presumptively lawful ground on which to burden a Second Amendment claim, and the Defendants have made no showing of "a substantial link between the restrictions imposed . . . and the indisputable governmental interests in public safety and crime prevention." *Gould* at 907 F. 3d 674.

**Defendants erroneously conflate Plaintiffs claim under the Second Amendment to the United States Constitution with his claim under Article I, Section 22 of the Rhode Island Constitution.**

The Defendants mistakenly conflate Plaintiff's claims under the Second Amendment to the United States Constitution with his claim under Article I, Section 22 of the Rhode Island Constitution. Article 1, Sec. 22 of the Constitution of the State of Rhode Island provides "The right of the people to keep and bear arms shall not be infringed."

While this right is similar to that guaranteed by the Second Amendment, it goes further. The Rhode Island Supreme Court has explained that shall issue provisions of R.I. Gen. Laws § 11-47-11 are required to protect the Article 22 rights of Rhode Islanders. "Because anyone who meets the conditions of § 11-47-11 is entitled to a gun permit, this mandatory requirement supplies the necessary safeguards to the right to bear arms in this state and vindicates the rights set forth in art. 1, sec. 22, of the Rhode Island Constitution." *Mosby*, 851 A. 2d at 1048. Indeed, the Rhode Island Supreme Court itself has specifically drawn a distinction between the mandatory permits under § 11-47-11 and the discretionary permit under § 11-47-18 noting that

with respect to discretionary licensing statues like § 11-47-18. Cf. *Peterson v. Martinez*, 707 F.3d 1197, 1212 (10th Cir. 2013) and *Peruta v. Cnty. Of San Diego*, 824 F.3d 919, 942 (9th Cir. 2016) (applying interest balancing approach to conclude that concealed carry rights are outside the scope of the Second Amendment's protections).

Although Rhode Island law does not define the term "unsuitable" there are certain individuals who are categorically disqualified as a matter of law. See §§ 11-47-5, 11-47-6, 11-47-7, and 11-47-15 The Rhode Island Supreme Court has been clear that the exercise of discretion by a licensing official under 11-47-11(a) cannot constitutionally be carte blanche to decide who may exercise their constitutional rights. *Mosby* at 851 A.2d at 1051. Instead the Rhode Island Supreme Court has emphasized that "[a]s a matter of policy, this Court will not countenance any system of permitting under the Firearms Act that would be committed to the unfettered discretion of an executive agency." *Gadomski v. Tavares*, 113 A. 3d 387 (quoting Mosby, 851 A.2d at 1050). To do so, explained the *Gadomski* Court, would render "rights flowing from article 1, section 22 of the Rhode Island "illusory". *Id.* The Gadomski court went on to reject the idea that criminal charges which had been dismissed were sufficient to justify a concealed carry permit denial. *Gadomski*, 113 A. 3d. at 392.

Other courts to consider the suitability requirement have likewise found limits on the scope of an administrative suitability determination. For example, faced with a facial challenge to Connecticut's suitability requirement, the Court in *Kuck v. Danaher*, 822 F. Supp. 2d 109, 128 (D. Ct. 2011), explained that the restriction was not unconstitutionally vague or overbroad because the requirement had traditionally been interpreted to require that the applicant must pose some appreciable danger to the public and that the determination be based on evidence. 822 F. Supp. 2d 109, 128-129. "[A]lthough the term "suitable" as used in Section 29-28(b) is not

statutorily defined, Connecticut courts have made clear that the purpose of imposing a suitability requirement is to ensure that persons who potentially would pose a danger to the public if entrusted with a handgun do not receive a permit." While this is most likely to occur in instances where individuals have a record of criminal behavior, it is conceivable, for example, that a finding of unsuitability might also be premised upon discovery of evidence that an applicant had a history of dangerous instability such that they had been banned from a shooting range for repeated failure to follow safety protocols, particularly if that fact were combined with some other evidence of continuing erratic, unsafe, or uncontrollable behavior. Moreover, under the doctrine of constitutional avoidance, the ordinary rule that statutes are to be read to avoid serious constitutional doubts, if that course is possible, *Jones v. United States,* 529 U.S. 848, 857 (2000), and here it is readily possible.

Contrary to the Defendants apparent contention that Rhode Island's firearms licensing authorities enjoy wide discretion to revoke a permit, the just cause requirement of the Firearms Act's Section 11-47-13, especially as informed by the requirements of the Second Amendment and Article I, Section 22 of the Rhode Island Constitution, must serve as a real limitation on the Licensing Authority's discretion. Accordingly, even if the Defendants claimed authority satisfies intermediate scrutiny, it exceeds the authority vested in local licensing officials under R.I. G.L. § 11-47-11(a) as properly cabined by Article I, Section 22 of the Rhode Island Constitution because to permit a revocation based on the mere social contacts of a permit carrier would render the right illusory.

**Once issued, a Rhode concealed carry permit is a constitutionally cognizable property interest.**

To have a property interest in the constitutional sense, the Supreme Court has held, it is not enough that one has an abstract need or desire for a benefit or a unilateral expectation.

Instead someone asserting a constitutionally cognizable property right must "have a legitimate claim of entitlement" to the benefit. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* Applying this maxim, the Rhode Island Supreme Court has made clear that under Rhode Island Law, licenses granted by the government represent property. *Leone v. Town of New Shoreham*, 534 A. 2d 871, 874 (1987) (*citing Sanderson v. Village of Greenhills*, 726 F.2d 284, 286 (6th Cir.1984)).

Pointing *Haeker v. Linder*, 2016 U.S. Dist. LEXIS 96087 *12 (D. Mont., July 22, 2016), Defendants argue that the broad discretion granted to the Montana sheriff who revoked the Haeker plaintiff's concealed carry permit when a third party filed a protection order against him stands for the proposition that even in 'shall issue' jurisdictions licensing official's discretion defeats a claim of entitlement consistent with a 14th Amendment property right. But *Haeker* is an outlier. Courts in 'shall issue' statues generally have ruled that eligible applicants do have a property right in the retention of a permit. *See, e.g., Caba v. Weaknecht*, 64 A.3d 39 (Pa. Comm. Ct. 2013) (reviewing case law and concluding that a permit holder "was entitled to procedural due process protections when the Sheriff revoked his license"); *DeBruhl v. Mecklenburg Cnty. Sherrif's Off.*, 815 SE 2d 1, 6 (N.C. Ct. App. 2018) ("Because the statute does not give the local sheriff unfettered, unassailable discretion in the issuance of permit renewals, an applicant enjoys a legitimate claim of entitlement to renewal so long as the enumerated criteria have been satisfied") Rhode Island licenses may only be revoked for "just cause." R.I. Gen Laws § 11-47-13. In contrast, because Montana already extended the right to open carry without a permit, even

though the concealed carry statute was purportedly "shall issue" the discretion exercised by the Sheriff in that case is much more akin to the broad discretion excised by the Rhode Island Attorney General under R.I. Gen Laws § 11-47-18. In sharp contrast, North Carolina has recognized that revocation of a previously issued concealed carry permit does in fact trigger due process protections.

Rather than a grant of broad discretion, the 'just cause' requirement is a real and substantial limitation on licensing authorities' discretion. The U.S. Supreme Court has specifically found that state rights dependent on a "for cause" determination, trigger due process requirements. Thus, for example, where state court holdings required that private utilities terminate service only for cause (such as non-payment of charges), then a utility is required to follow procedures to resolve disputes about payment or the accuracy of charges prior to terminating service. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978); The High Court has gone so far as to note that "[t]he hallmark of property, . . . is an individual entitlement grounded in state law, which cannot be removed except "for cause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-433 (1982) (quoting *Memphis Light*, 436 U.S. at 1); See, also e.g., *Barry v. Barchi*, 443 U. S. 55 (1979) (horse trainer's license protected); *Mathews v. Eldridge*, 424 U. S. 319 (1976) (disability benefits); *Goss v. Lopez*, 419 U. S. 565, 419 U. S. 573-574 (1975) (high school education); *Connell v. Higginbotham*, 403 U. S. 207 (1971) (government employment); *Bell v. Burson*, 402 U. S. 535 (1971) (driver's license); *Goldberg v. Kelly*, 397 U. S. 254 (1970) (welfare benefits).

The Defendants attempts to rely upon *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972) to defeat Plaintiff's claim of a property right is misplaced. Unlike in the case at bar, where the plaintiff seeks to assert his due process rights with respect to a current and ongoing

(prior to revocation) interest, in *Roth*, the claimant's asserted interest was in a new employment contract after the expiration of his one year contract. *Cf. Perry v. Sindermann*, 408 U.S. 593, 601 (1972) (Due process applied where "existing rules or understandings" were deemed to have the characteristics of tenure, and thus provided a legitimate expectation of reemployment).

Defendants' attempts to argue for a "closely regulated field" exception to the due process clause is similarly misplaced. No such exception exists. Instead the United States Supreme Court has been very clear, "[o]nce licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. Suspension of issued licenses thus involves state action that adjudicates important interests of the licensees. In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment." *Sniadach v. Family Finance Corp*., 395 U.S. 337 (1969); *Goldberg v. Kelly*, 397 U.S. 254, (1970). This is but an application of the general proposition that relevant constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege.' *Sherbert v. Verner*, 374 U.S. 398 (1963) (disqualification for unemployment compensation); *Slochower v. Board of Higher Education*, 350 U.S. 551 (1956) (discharge from public employment); *Speiser v. Randall*, 357 U.S. 513 (1958) (denial of a tax exemption); Goldberg, 397 U.S. 254 (withdrawal of welfare benefits); *Guillemard-Ginorio v. Contreras-Gómez*, 490 F.3d 31, 40 (1st Cir. 2007) (The revocation or suspension of an insurance license without a pre-deprivation hearing violates procedural due process). Because Rhode Island officials lack the discretion to deny a permit under 11-47-11(a), in contrast to the broad discretion they enjoy under 11-47-18, a concealed carry permit issued pursuant to 11-47-11-(a) is a property right that triggers due process protections.

**Once issued, a Rhode concealed carry permit is a constitutionally cognizable liberty interest.**

As with the Property interest analysis, the rights and statuses that rise to the level of "liberty" interests are not susceptible of exhaustive recitation, or easy definition. *See Paul v. Davis*, 424 U.S. 693, 710, (1976) ("It is apparent from our decisions that there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either `liberty' or `property' as meant in the Due Process Clause.")." However, the Supreme Court has emphasized that "in a Constitution for a free people, there can be no doubt that the meaning of `liberty' must be broad indeed." *Bd. of Regents v. Roth*, 408 U.S. 564, 572, (1972). "Broad" is certainly an apt description, given how the United States Supreme Court once illustrated the liberty protected by the Due Process Clause:

> Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.

*Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Indeed, the *Board of Regents v. Roth* Court itself addressed (at least tangentially) whether future employment prospects could present a liberty interest sufficient to engage due process requirements. 408 U.S. at 564. As it turned out, the State had not stigmatized Mr. Roth, but the Court observed that if it had done so, "this would be a different case" because "[t]here might be cases in which a State refused to re-employ a person under such circumstances [such] that interests in liberty would be implicated." *Id*. at 573. Even Paul itself did not preclude the loss of

future employment opportunities from serving as the "plus": "Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity." *Paul*, 424 U.S. at 705-06, 96 S.Ct. 1155 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 898 (1961)).

Government-imposed stigmas affect liberty interests when the State requires a Criminal History Search as a condition to government benefits, employment, or the exercise of certain rights. *See, e.g., Humphries v. County of Los Angeles*. 554 F.3d 1170 (9th Cir. 2009) (considering the due process implications of being listed on California's Child Abuse Central Index ("CACI")), rev'd on other grounds sub nom Los Angeles v. Humphries, 562 U.S. 29 (2010); *See also, Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994) (finding a sufficient stigma plus to trigger a liberty interest where "[plaintiff] is not going to be refused employment because of her reputation; she will be refused employment simply because her inclusion on the list results in an added burden on employers who will therefore be reluctant to hire her.")

Here, the permanent record of a concealed carry permit revocation falls into the carveout recognized by *Paul*. 424 U.S. at 705-06. Plaintiff has due process right to avoid the stigma attendant a revocation of his concealed carry permit. Applications for employment as a police officer regularly seek to identify and weed out applicants who have had concealed carry permits revoked. Ex. 2, *Affidavit of Pedro Alvarez Jr*. Patrolmen employed by recruiting departments have told Mr. Alvarez that a revocation would constitute a "Black Mark" on his application. *Id*. Indeed, even Col. Lynch recognized that the record of a revocation would constitute a stigma that would make it more difficult, if not impossible to obtain work as a police officer as

> 10    Q. Do you believe that it would be more difficult
> 11    for him to be hired as a police officer with a
> 12    revocation on his record?
> 13    A. Yes, sir, I do.

**14**    Q. Would you ever hire a police officer with a
**15**    revocation on his record?
**16**    A. Not with this fact pattern.

Deposition of Def. Lynch Tr. 46:1-16.

This despite the fact that it is work for which Mr. Alvarez, as a military police officer, is otherwise eminently qualified.  Col. Lynch's revocation of Mr. Alvarez's permit therefore works exactly as the "badge of . . . infamy" and "attendant foreclosure from other employment opportunity" Paul indicated triggered due process protections. 424 U.S. at 705-06.  Accordingly, because of the extreme consequence of Col. Lynch's revocation, Plaintiff had a protected liberty interest entitled to due process protections.

**Defendants failed to afford Plaintiff a Pre or Post-Deprivation Hearing**

Having determined that Plaintiff had legally cognizable property and liberty interests that trigger due process protections, the next question for the court must be what protections are required.  *Mathews*, 424 U.S. at 333. "Due process always requires, at a minimum, notice and an opportunity to respond." *United States v. Raya-Vaca*, 771 F.3d 1195, 1204 (9th Cir. 2014). (failure to inform petitioner of the charge against him and to provide him with the opportunity to review the sworn statement constituted a violation of petitioner's due process rights). Moreover, the United States Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest." *Mathews*, 424 U.S. at 333 (1976) (citing *Wolff v. McDonnell*, 418 U.S. 539, 557-558 (1974)).

In *United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012), The First Circuit made clear:

> [T]he right to possess arms (among those not properly disqualified) is no longer something that can be withdrawn by government on a permanent and irrevocable basis without due process. Ordinarily, to work a permanent or prolonged loss of a constitutional liberty or property interest, an adjudicatory hearing, including a right to offer and test evidence if facts are in dispute, is required.

21

Id. at 48.

Plaintiff concedes that there are circumstances, like when a permit holder has been charged with a new crime of violence, where summary revocation with attendant post-revocation process is the appropriate response. Thus, for example in Hightower the First Circuit failed to find a due process violation where a Massachusetts statute provided for summary revocation with robust post-deprivation process upon the "occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed," or that "it appears that the holder is no longer a suitable person to possess such license." *Hightower v. City of Boston*, 693 F. 3d at 84. (quoting Mass. Gen. Laws ch. 140, § 131(f)). Here, however, nothing in the record suggests a need to revoke Mr. Alvarez' permit before holding a hearing on the same. The pictures do not represent or depict any criminality on the part of Mr. Alvarez. Nor is there even an indication as to when the pictures were originally taken or posted. As such, the public interest could have been served just as effectively with a noticed hearing and an opportunity to respond.

More troubling, however, is the lack of post deprivation process afforded to Mr. Alvarez. The Defendants erroneously attempt to equate the scheduled June 13, 2018 meeting between Plaintiff and Col. Lynch with a post-deprivation hearing. Due process requires the right to be heard at a meaningful time. *Mathews*, 424 U.S. at 333 (1976) The facts simply do not support the Defendants contentions that the June 13th Meeting was to be a hearing.  Plaintiff was told by Lieutenant Pitts that the decision had already be made, it would not be subject to reconsideration, and that the only purpose of the meeting was to explain the decision to him.  SOF 35. This state of affairs was confirmed at the deposition of Col. Lynch when he indicated that he had already made up his mind, that he wanted the permit on the morning of June 8th and that he never noticed

a post deprivation hearing for the Plaintiff. SOF 32, 37. This was not an opportunity to present evidence and be heard, but rather an opportunity to be spoken to. Moreover, the mere fact that the Plaintiff could petition the Rhode Island Supreme Court, by writ of Certiorari[4], for discretionary review of the Chief's decision is not sufficient process to protect against the complete lack of process afforded to Plaintiff before, during, and after his permit was revoked. "Certiorari is a prerogative writ and its issuance and the accompanying relief it provides are discretionary and not a matter of right. *In re: Little*, 237 A.2d 325, 328 (RI 1968). Such a review presents no opportunity to correct the administrative record, nor does it provide for an opportunity to be heard at a meaningful time and manner.  In contrast, the *Hightower* Court cited approvingly Massachusetts provisions that required the district court to hold an evidentiary hearing to review license revocations. *Hightower,* 693 F. 3d at 84. (quoting Mass. Gen. Laws ch. 140, § 131(f)).

Indeed, the Rhode Island Supreme Court has itself suggested that due process requires an evidentiary hearing on permits denied under 11-47-11(a), the state's shall-issue licensing provision. Importantly, no Rhode Island law provides for process to review a license revocation. Though the Rhode Island Supreme Court in *Mosby v. Devine*, 851 A.2d 1031 (2004), did establish that certain decisions under the Rhode Island Firearms Act are reviewable by petition for Certiorari, *Mosby* was limited to establishing that review of initial licensing determinations under the Rhode Island Firearms Act. *Id*. at n.39. Indeed, the *Mosby* Court itself suggested that

---

[4] Under Rhode Island rule of Appellate Procedure 13, governing the issuance of extraordinary writs including a writ of Certiorari requires "a copy of any order or opinion which the petitioner seeks to have reviewed *and any other parts of the record which may be essential* to an understanding of the matters set forth in the petition." (Emphasis added). Yet, the Rhode Island Rules of Appellate Procedure makes no provision for discovery or for an applicant like Plaintiff here to obtain the record which may be essential.

another approach might be needed to challenge a revocation. *Id*. "There is a crucial distinction between being deprived of a liberty one has . . . and being denied a conditional liberty one desires." *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 9 (1979). In recognition of this "crucial distinction" the Mosby Court observed that "a different result [from Mosby's requirement to seek review by Petition for Certiorari] may be reached if the Department sought to discontinue or revoke a permit that already had been obtained." Mosby, 851 A. 2d at n.39. That time has come. Mr. Alvarez was entitled to a fair opportunity to review the administrative record, to challenge negative inferences made against him, and to otherwise challenge his permit revocation. He was never afforded that opportunity.

**The Taking Claim**

As Defendants correctly note, where Government has not "explicitly created a property right in a permit" the correct analysis focuses on the "degree to which the [government] has restrained its own discretion relating to the permit. *See Fed. Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1197 (10th Cir. 1999) (internal citation omitted). Here applying that standard we see that contrary to the Defendants assertions, the Chief's discretion is severely curtailed and restrained. In granting the permit a licensing authority subject to R.I. Gen. Laws  § 11-47-11 must issue upon a determination that the applicant 1) has a proper purpose; 2) is technically qualified; 3) and is not unsuitable. Id. In revoking a permit such a revocation may only take place for cause. Whereas the zoning decisions cited by the defendants generally permit the contemplation of what's in the best interest of the community, the licensing authorities here are tasked only with determining whether the statutory criteria are satisfied. As such, once a license has been issued, revocation of the same for other than cause constitutes a compensable taking.

**A The Conspiracy and First Amendment Claims.**

Defendants Motion for Summary Judgment was filed prior to the completion of discovery in this matter. Discovery now having been completed, Plaintiff no longer seeks to press his conspiracy claims under 42 USC § 1985(3) or 42 USC § 1986.  With respect to Plaintiff's First Amendment claim, Plaintiff only asserts such a claim to the extent Defendants rely on Alvarez' former dating relationship with a sister of an alleged member of one of the subject gangs to substantiate their claim of an affiliation and relies upon the cases cited in the Defendants brief for the proposition that such an intimate relationship may not form the basis of a governmental sanction.

**Conclusion**

For the foregoing reasons, the Plaintiff respectfully requests that this Honorable Court deny the Defendants Motion for Summary Judgment and Grant the Plaintiff's Cross Motion for Summary Judgement. Plaintiff respectfully requests that this matter be set down for hearing and argument.

Plaintiff,
By his Attorney

/s/ Matthew Fabisch
Matthew Fabisch #8017
664 Pearl St.
Brockton, MA 02301
401-324-9344
Fabisch@Fabischlaw.com

**CERTIFICATION OF SERVICE**

I hereby certify that the within document has been electronically filed with the Court on this 31[th] Day of August, 2020 and is available for viewing and downloading from the ECF system. I further certify that a true and accurate copy of the within was served by electronic means to:

Ryan Stys, Esq.

Ryan@desistolaw.com

/s/Matthew Fabisch